IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2024 Session

## STATE OF TENNESSEE v. KEIRESHA MAJORS

**Appeal from the Criminal Court for Davidson County**
**No. 2020-A-746     Jennifer Smith, Judge**

_____

### No. M2023-01182-CCA-R3-CD

_____

A Davidson County jury found the Defendant, Keiresha Majors, guilty of one count of second degree murder, for which she was sentenced to twenty-five years' incarceration. On appeal, the Defendant challenges the sufficiency of the convicting evidence, the admission of recordings of a Facebook Live broadcast she recorded shortly after the victim's murder, the restriction of cross-examination of a witness, and the length of her sentence. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Emma Rae Tennent, Assistant Public Defender (on appeal); Martesha Johnson Moore, District Public Defender; and Joan Lawson, Anne Berry, and Michaela R.M. Strout, Assistant District Public Defenders (at trial), for the appellant, Keiresha Majors.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah M. Housel and David O. Jones, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

On March 10, 2020, a Davidson County grand jury indicted the Defendant for the October 27, 2019 murder of the victim, Kaylin Smith, charging her with a single count of premeditated first degree murder. The Defendant's trial commenced on January 30, 2022.

### A. Trial

At trial, Bria Singletary testified that she and the Defendant became friends through Facebook. On October 27, 2019, the Defendant invited Ms. Singletary to join her at a party hosted by the Defendant's cousin, Brittany Majors.[1] Though Ms. Singletary did not know the Defendant well, she accepted the Defendant's invitation because the Defendant had "cool vibes." The Defendant picked Ms. Singletary up around 5:30 p.m., and the two traveled to Brittany Majors's apartment, where they joined their host and her children. There, Ms. Singletary, Brittany Majors, and the Defendant began "drinking, laughing, [and] talking." Ms. Singletary estimated that she drank two shots' worth of peach-flavored Paul Masson brandy. She also recalled that at some point during the party, she and the Defendant went to a liquor store to purchase cigars and more brandy. Ms. Singletary testified that though the Defendant had been drinking throughout the night, she did not seem impaired while driving and spoke clearly.

Ms. Singletary recalled that the victim arrived at Brittany Majors's apartment later in the evening. Ms. Singletary testified that though the victim and the Defendant initially got along, they soon began arguing and "bickering" "in each other's faces." As their argument escalated, Ms. Singletary attempted to intervene by pushing the victim away from the Defendant. The victim and the Defendant stopped arguing, and Ms. Singletary sat and "dozed off" on a nearby couch. Ms. Singletary was later awakened by the victim and the Defendant resuming their argument. Ms. Singletary was unsure of the subject of the argument but recalled that the Defendant told the victim, "Don't make me go to my car," and then left the apartment.

After the Defendant's exit, Brittany Majors asked Ms. Singletary to go outside to "check on" the Defendant. Ms. Singletary stated that though she did not want to do so because "everybody had already made me mad," she followed the Defendant outside the apartment. Ms. Singletary exited the apartment and walked into the breezeway between the apartment units. She testified that she "peeked" around the corner of the building and did not see the Defendant. However, when she attempted to return to Brittany Majors's apartment, she found the door locked. Ms. Singletary knocked on the door and, upon stating her name to Brittany Majors, was admitted. Brittany Majors locked the door again after Ms. Singletary reentered the apartment. The Defendant followed soon after Ms. Singletary, and Ms. Singletary recalled that the victim asked Brittany Majors not to let the Defendant inside. Ms. Singletary also recalled that Brittany Majors told the Defendant not to "come in here with that bullshit" because her children were in her apartment. The Defendant responded that she did not intend to cause trouble and simply needed to use the restroom, so Brittany Majors unlocked the door.

Ms. Singletary recalled that she stood "very close" to the apartment's door and watched as the Defendant entered the apartment, withdrew her firearm, "cocked it back,"

[1] Because Brittany Majors shares the Defendant's surname, we will refer to her by her full name for clarity.

and approached the victim. Ms. Singletary did not believe that the Defendant had been armed before she returned to the apartment and averred that she would have seen any firearm on the Defendant's person because the Defendant had been "sagging" her pants. Ms. Singletary described the victim as "clearly frightened" by the Defendant, noting that she had retreated to a corner of the room. As the Defendant approached, the victim attempted to take the Defendant's gun away from her, and a fight ensued. At some point during the victim and the Defendant's struggle for possession of the firearm, the two fell to the ground. Ms. Singletary testified that the victim pulled the Defendant's hair during the fight. She also recalled that the victim protested that the Defendant was trying to "take me away from my kids," to which the Defendant replied, "F*** your kids." Ms. Singletary stated that the victim punched the Defendant in the mouth and that the Defendant then shot the victim.

Ms. Singletary testified that after the victim was shot, the victim grabbed her side, exited the apartment, and collapsed in the breezeway. Ms. Singletary followed the victim and attempted to staunch her bleeding while she waited for an ambulance to arrive. Latronnia Howard, another of Brittany Majors's guests, knocked on the door of an adjacent apartment to summon help and attempted to pull Ms. Singletary away from the victim. Ms. Singletary refused to leave the victim and attempted to comfort the victim by speaking to her. Ms. Singletary recalled that the victim grabbed her hand and squeezed it once before dying. Afterwards, the Defendant exited the apartment, told the victim that she loved her, and walked away "with the gun in her hand." Ms. Singletary estimated that the Defendant called her six times after the Defendant left Brittany Majors's apartment.

On cross-examination, Ms. Singletary testified that the police arrived within minutes of the shooting. In her statement to the police, Ms. Singletary averred that she had been inside the apartment when she heard a loud "bang." When she exited the apartment to investigate, she saw the victim lying in the breezeway. In a separate statement, Ms. Singletary said that she had been asleep when the victim was shot. However, Ms. Singletary later told Detective Thomas Miller the shooting had occurred inside the apartment.

Ms. Singletary recalled that the Defendant was sober when she drove to the liquor store but became drunk after returning to the party. She stated that she did not see the Defendant's firearm while she was in the Defendant's vehicle. Though she described the firearm as small enough to be easily concealed in a pocket, she reiterated that she would have noticed if the Defendant was armed prior to her return to the apartment.

Metro Nashville Police Department ("MNPD") Officer Abigail Malone testified that she was the first officer to arrive in response to the shooting. She recalled that the victim appeared to have collapsed in the breezeway and was surrounded by four other women. One of these bystanders, who she later identified as Ms. Singletary, held a towel to the victim's chest. Officer Malone noted that the victim did not appear to be bleeding

when she arrived, and she did not take her pulse, though she encouraged Ms. Singletary to continue applying pressure to the victim's wound.

After an ambulance arrived and the victim was pronounced deceased, Officer Malone moved the four witnesses away from the victim's body and interviewed them. She identified these witnesses as Brittany Majors, Ms. Singletary, Ms. Howard, and Ronesha Waters Johnson,[2] who lived in an adjacent apartment. Officer Malone described these witnesses as "pretty upset." She testified that the women stated that they had not witnessed the shooting and instead had heard a gunshot and gone outside to investigate. Initially, none of the witnesses identified the Defendant as the shooter. However, as more officers arrived at the apartment complex and a crowd of curious residents began to form, Ms. Howard and Brittany Majors requested to speak with Officer Malone privately. After moving away from the crime scene, Ms. Howard and Brittany Majors told Officer Malone that the Defendant had shot the victim and then fled the apartment. They also noted that the Defendant went by the nickname "Loco."

Officer Jason Terry, a crime scene investigator for the MNPD, also responded to the shooting. Upon arriving, he saw the victim's body lying face-up in a breezeway between apartment units 161 and 162. Officer Terry noted that the victim appeared to have injuries to the top of her hand and to her fingernails. Officer Terry also collected several pieces of evidence, including an empty bottle of peach-flavored Paul Masson brandy, a green towel, a white hat, a plastic cigarette tip, and an empty "Black and Mild" cigar package from the breezeway. Officer Terry also searched Brittany Majors's apartment after learning that the shooting had occurred there rather than in the breezeway. He testified that he did not see or recover anything of evidentiary value from Brittany Majors's apartment.

Brittany Majors testified that the Defendant was her cousin and identified her in court. Brittany Majors stated that the Defendant and the victim had previously dated and that she came to know the victim because of the victim's relationship with the Defendant. Though she knew the victim and the Defendant had recently separated, she believed "they were still cool." Brittany Majors noted that she and the victim had become close friends prior to the victim's death.

On October 26, 2019, Brittany Majors began planning to host a few friends at her apartment. She explained that this was her first opportunity to "chill" and "have a good time" with her friends since she had her baby, approximately one month previously. Brittany Majors posted an invitation to her friends to come over to her apartment via Facebook. Ms. Howard and the victim responded to this invitation, and the three began "a conversation of how they were coming to [her] house." The Defendant, evidently having

---

[2] The transcript, several witnesses, and the parties' briefs refer to Ronesha Waters Johnson alternatively as Ms. Waters, Ms. Johnson, and Ms. Waters-Johnson. For clarity, we will refer to this witness as Ms. Johnson, as she stated she preferred to be addressed.

seen this conversation, asked Brittany Majors whether she could visit her before the victim arrived, and Brittany Majors agreed. Shortly after the Defendant and Ms. Singletary arrived, the Defendant began a Facebook Live broadcast in which she recorded herself at Brittany Majors's apartment. Brittany recalled that the victim commented on the broadcast that Brittany Majors was "fake." Though Brittany Majors believed that the victim was "playing," she called the victim to ask what she meant. The victim explained that despite knowing they had separated, Brittany Majors had invited both the victim and the Defendant to the party at her apartment. Overhearing this conversation, the Defendant offered to leave, but the victim conceded that the Defendant could stay.

Brittany Majors described her party as a "good time" in which she and her guests drank and smoked together, though she noted that she frequently had to leave the group to check on her three children in the "back bedroom." Brittany Majors stated that she did not permit her guests to smoke inside her apartment because she had a newborn, so the group eventually left to smoke cigars in the breezeway. While outside, the group split into two, with the victim and the Defendant going downstairs and Brittany Majors, Ms. Howard, and Ms. Singletary hanging back to take pictures of one another. Brittany Majors averred that she did not notice any problems between the victim and the Defendant until the group reentered the apartment. When the group returned to the apartment, Brittany Majors went to check on her children. Upon returning to the living room, she saw the victim and the Defendant "brawling" and pulling each other's hair.

Brittany Majors recalled that she attempted to persuade the victim and the Defendant to stop fighting and to take their dispute outside because she did not want them to wake her children. She stated that this prompted the Defendant to leave her apartment. Brittany Majors testified that she asked Ms. Singletary to follow the Defendant to check on her. While the two were gone, Brittany Majors locked the door to her apartment, located in the living room, to ensure the Defendant could not reenter until she had "cooled off." Brittany Majors described the victim as "distraught" and recalled that she apologized for fighting the Defendant. Shortly after Ms. Singletary left, she returned, and Brittany Majors readmitted her and locked her door again. The Defendant soon followed, and, speaking to her through her door and watching her through the peephole, Brittany Majors told the Defendant not to return to her apartment "on no BS." Brittany Majors testified that she did not see the Defendant holding a firearm while she stood at the door. After confirming that the Defendant had calmed down "at least three" times, Brittany Majors allowed the Defendant to reenter her apartment.

Brittany Majors testified that the Defendant "came right in[side]," pulled out her gun, and pointed it in the victim's face. She recalled that the victim stated that the Defendant was trying to "take me away from my kids," to which the Defendant replied, "F*** your kids." The victim then "grab[bed] the gun and point[ed] it down," and a fight ensued over control of the firearm. Brittany Majors stated that the victim and the Defendant eventually fell to the ground in their fight but that the Defendant maintained control of her

firearm throughout the fight. She testified that the fight concluded when the Defendant pointed her firearm at the victim and shot her in the chest.

Brittany Majors recalled that after the victim was shot, she opened the door, walked outside, and collapsed in the breezeway. Brittany Majors testified that she, the Defendant, and Ms. Singletary followed the victim into the breezeway and that the Defendant stated, "I've got to go," and "bolted." Brittany Majors stated that she briefly assisted Ms. Singletary in applying pressure to the victim's wound before knocking on Ms. Johnson's door to ask for her help. She recalled that "someone" gave her a towel, which Ms. Singletary held against the victim's wound.

Brittany Majors testified that she did not initially want to tell the police that the Defendant had shot the victim because she was still frightened by the experience and because the Defendant was a member of her family. She recalled that she felt "frozen" in shock by the Defendant's actions and worried for her children, who had been in the "back bedroom" when the victim was shot. Brittany Majors identified the Defendant during an interview the day after the shooting, though she averred that the shooting had not occurred inside her apartment and that she did not know many details. She stated that she had been afraid to tell the police the truth because she was getting "backlash[] from [the victim's] family, people that I've never seen. I was getting maced in Kroger."

Brittany Majors also described a phone call she received several days after the victim's murder. She was unable to remember the caller's name but noted that the caller "kept saying [she was the victim's] sister." During this conversation, Brittany Majors admitted that she had seen the shooting and that it had occurred inside her apartment. She also noted that she "rambled" about the shooting and "said some things that didn't make sense" because she was "just saying stuff to get people off my back . . . because it was just a lot going on." She stated that she was reluctant to admit that the shooting had occurred inside her apartment because she was afraid of being "charged with something."

On cross-examination, Brittany Majors estimated that the Defendant and Ms. Singletary were at her apartment an hour before the victim and Ms. Howard arrived. She also recalled that when the victim and the Defendant split off from the group while they were outside, she heard them speaking and occasionally laughing. She was surprised by the fight between the victim and the Defendant and believed it had been caused by an offensive remark, which she did not hear. Brittany Majors averred that she knew the Defendant carried a gun because the Defendant occasionally posted pictures of the firearm on Facebook. She noted that the firearm was "small enough to where I couldn't see it" when the Defendant was armed.

Ronesha Waters Johnson testified that she lived in apartment 161, across the breezeway from Brittany Majors's apartment. On October 26, 2019, Ms. Johnson exited her apartment to take out her trash and saw Brittany Majors standing in the breezeway with

the Defendant and Ms. Singletary. Brittany Majors invited Ms. Johnson to join her party, and Ms. Johnson agreed. Ms. Johnson stated that she had never met any of Brittany Majors's guests prior to the party.

Ms. Johnson testified that she had been at the party for approximately two hours and that for the entirety of that time, the group stood in the breezeway. Ms. Johnson stated that she never entered Brittany Majors's apartment. Ms. Johnson recalled that at around 10:40 p.m., the Defendant invited her to accompany her and Ms. Singletary to a liquor store. Ms. Johnson declined this invitation. She described the Defendant as "already drunk" and noted that the Defendant held an empty liquor bottle while they spoke. The Defendant and Ms. Singletary left, and the victim and Ms. Howard arrived while they were gone. Ms. Johnson stated that when the victim learned the Defendant would be returning to the party, she expressed her frustration with the Defendant. The victim explained that she and the Defendant had broken up and that she had been ignoring the Defendant's phone calls for two weeks because the victim had begun dating someone else. Ms. Johnson recalled that Brittany Majors asked the victim to stay at the party, and the victim agreed, stating that she would "act like I'm drunk so maybe she will leave me alone."

Ms. Johnson testified that after the Defendant and Ms. Singletary returned from the liquor store, the Defendant struck up a conversation with the victim and sat beside her on the stairs adjacent to the breezeway. Ms. Johnson described the Defendant as "hanging on" the victim and noted that when the victim attempted to walk away from the Defendant, the Defendant grabbed the victim's hands and held her against the wall. The Defendant asked the victim why she had been ignoring her phone calls, and the victim explained that the Defendant "always caus[ed] a commotion." Ms. Johnson testified that she asked the Defendant to leave the victim alone but that the Defendant refused. She also recalled that the Defendant followed the victim every time she attempted to leave the conversation and rejoin the party.

Ms. Johnson stated that she did not drink alcohol at the party, but that Brittany Majors and her guests were "continually drinking." Concerned that the party was about to "get carried away," Ms. Johnson said goodbye and returned to her apartment to go to bed. Shortly after laying down, Ms. Johnson heard a gunshot. Ms. Johnson explained that she did not find this worrisome because gunshots were frequent in her neighborhood, but she nevertheless looked out of her bedroom window. Ms. Johnson testified that she saw the Defendant running away from the apartment building. Soon thereafter, Ms. Johnson heard a "bang[ing]" at her door and, upon answering it, was met by Brittany Majors asking her to drive the victim to the hospital. Ms. Johnson then saw the victim lying in the breezeway. She recalled that she believed that the victim had fallen because she was so drunk and that the victim had "so much blood coming out of nose and her mouth." Ms. Johnson stated that someone had called 911 and that Ms. Howard and Brittany Majors were attempting to tell the police what happened, but because they were "screaming and crying," she took the phone and gave directions to the apartment complex. Ms. Johnson also retrieved her first-

aid kit and joined Ms. Singletary in attempting to administer aid to the victim, but soon realized the victim had died.

Ms. Johnson testified that she spoke with the police when they arrived. She explained that Brittany Majors had been hosting a party, that they had been drinking, and that the Defendant had also been present but had left. While the detectives took statements from the other witnesses, Ms. Johnson noticed that Ms. Singletary received several phone calls from the Defendant, which she repeatedly declined. She stated that she was unable to reenter her apartment because of its proximity to the crime scene and that while she stood outside, she saw that the Defendant had begun a Facebook Live broadcast. Ms. Johnson watched this broadcast and recalled that the Defendant expressed her frustration that Ms. Singletary was not answering her calls.

MNPD Officer Brenna Hosey testified that in the early hours of October 27, 2019, she responded to a call from the Defendant's uncle, who stated that he had driven the Defendant to the Davidson County night court to surrender to the police. The Defendant's uncle explained that the Defendant believed a warrant for her arrest had been issued. After determining that no such warrant had been issued, Officer Hosey interviewed the Defendant, who explained that she believed she would be charged for the victim's murder. Officer Hosey testified that the Defendant did not appear drunk. During the interview, the Defendant explained that while playing cards at a party, she began arguing with the victim. As their argument escalated, the victim reached for the Defendant's pocket, where the Defendant stated the victim knew she kept her gun. The victim and the Defendant began physically fighting one another, and the Defendant explained that at some point during the fight, her gun fired, and the victim was shot. Officer Hosey recalled during her interview with the Defendant hearing a dispatch regarding the shooting, so she contacted the responding officers. Officer Hosey then drove the Defendant to the MNPD's North Precinct. She described the Defendant as "willing" and "cooperative."

MNPD Detective Anthony Heil testified as an expert in digital forensics. Detective Heil testified that three cell phones had been recovered from the breezeway, one of which was identified as belonging to the Defendant. A data extraction was performed on the Defendant's cell phone, a report of which was introduced through Detective Heil's testimony. Detective Heil testified that the Defendant had made no phone calls nor sent any text messages from 10:37 p.m. on October 26 until 1:01 a.m. on October 27, 2019. He noted that five outgoing phone calls had been placed to the same number between 1:12 a.m. and 1:23 a.m. and that each lasted between two and three seconds, which he stated could indicate the caller had reached the recipient's voicemail and hung up. Detective Heil also identified a text message sent at 2:11 a.m. to a contact named Keonna reading, "Icnt [sic] Dey Tryna Say I Killd Ha." Detective Heil stated that the data extraction was unable to recover data from third-party applications like Facebook.

Dr. Erin Carney testified as an expert in forensic pathology. Dr. Carney testified that she performed an autopsy of the Defendant's body which revealed that the victim had been shot in the left side of her chest. Dr. Carney's examination concluded that the gunshot had punctured the victim's left lung and grazed the victim's heart, which caused blood to pool in the victim's lung. She was unable to identify any gunpowder, soot, or stippling on the victim's skin or clothing. She noted that the victim had sustained several minor injuries, including an abrasion on her left breast, bruising on her left forearm and right knee, a scratch on her right knee, a fractured thyroid cartilage. She also noted that the victim had worn artificial fingernails and that one was missing and another was broken.

Former MNPD Detective Thomas Miller testified that he investigated the victim's murder. He estimated that he arrived at the apartment complex between 1:10 and 1:15 a.m. on October 27, 2019. He testified that when he arrived at the apartment complex, he saw several individuals standing near the victim's body in the breezeway. While there, he interviewed the potential witnesses and recalled that none of them were "very forthcoming" with information. He also stated that his initial assumption was that the victim had been shot in the breezeway rather than inside Brittany Majors's apartment.

Detective Miller recalled that during his interviews with the potential witnesses, one of them showed him the Defendant's Facebook Live broadcast. Detective Miller testified that he watched a portion of the broadcast and that he planned to get the full recording "directly from Facebook" later but was unable to recover it. However, Precious Stevenson, the victim's sister, took a series of recordings of the Defendant's Facebook Live broadcasts and sent them to Detective Miller. These recordings were played for the jury.

During her Facebook Live broadcast, the Defendant stated that though she and the victim frequently had physical fights, she would "never hurt" the victim and "would die" for her. The Defendant threatened to "kill everybody that say I did something to her" even if she went to jail, and she noted that she always carried her gun with her. Because Ms. Stevenson recorded the Facebook Live broadcast while the Defendant was still recording it, her comments to the Defendant were visible on the video as she typed them. Ms. Stevenson wrote several comments to the Defendant which levied insults at the Defendant and accused her of killing the victim. The Defendant responded directly to Ms. Stevenson's comments during her broadcast, telling Ms. Stevenson to "pull up" and that she would be waiting for her to arrive. The Defendant remarked that Ms. Stevenson "better not have nobody in the car with you" when she arrived, including her children.

The Defendant denied that she had killed the victim throughout her Facebook Live broadcast. She explained that she and the victim had dated for "so many years" and that she loved the victim "with all my heart." The Defendant explained that she attended the party at Brittany Majors's apartment and that when she arrived, she made it clear that she did not want to be present when the victim arrived because she and the victim argued so frequently. Though the Defendant and the victim had ended their relationship, the

Defendant maintained that "every post" she or the victim made on social media was designed to anger or get the other person's attention. The Defendant appeared to cry briefly before shouting in response to a comment from Ms. Stevenson, threatening to kill her and her "little ass son." She also made several disparaging remarks about Ms. Stevenson's weight.

The Defendant also spoke with several individuals not depicted in her broadcast. Though the Defendant initially maintained that she would not surrender herself to the police and that she would instead leave town, she later relented, asking two offscreen individuals if they would drive her to turn herself in. She explained that she did not intend to go to jail by surrendering herself to the police and that she did so simply to clear her name. After she ensured that someone would pick up her son from school, the Defendant walked outside and entered a vehicle, where she continued her broadcast. Another off-screen individual implored the Defendant to end her broadcast. The Defendant concluded her broadcast by stating that people were "tagging" her in their "statuses" and that she needed to "clear my s*** up."

In another recording of the Facebook Live broadcast, the Defendant stated that the victim knew the Defendant would have kept her firearm in her pocket and that the victim attempted to take it from her. The Defendant also responded to comments suggesting the victim was dead by repeatedly insisting that the victim was okay and that she would "come back." The Defendant agreed with another suggestion that she needed to go to the hospital to ensure that the victim was okay. The Defendant reiterated that she was recording Facebook Live broadcast to demonstrate her innocence.

Detective Miller interviewed the Defendant after she was taken to the MNPD's North Precinct, and a recording of this interview was played for the jury. In her interview, the Defendant conceded that she and the victim had a "small altercation" but maintained that she had not intended to hurt the victim. The Defendant stated that she and the victim had dated for four years before their separation approximately one month prior to the victim's death. She also noted that she and the victim physically fought one another frequently throughout their relationship and that the victim usually pulled the Defendant's hair during these fights.

The Defendant explained that she and Ms. Singletary arrived at Brittany Majors's apartment at approximately 7:00 p.m. on October 26, 2019. The Defendant recalled that she asked Brittany not to invite the victim because the victim got angry with the Defendant easily but knew when she went to the party that the victim would nevertheless be invited. The Defendant stated that she brought her firearm, which she described as a loaded nine-millimeter Kel-Tec pistol with a "hard trigger," with her to the party. She explained that a "hard trigger" made the firearm more difficult to shoot. Soon after the victim arrived at the party, she and the Defendant began arguing. The Defendant said the victim escalated this argument into a physical fight by pulling the Defendant's hair. The victim and the

Defendant began "wrestling" on the floor, and at some point, during the fight, the victim seized the Defendant's firearm. The Defendant said she fought to get the victim to release the firearm and recalled that Brittany Majors warned them that her children were in the apartment. The Defendant recalled that she held onto the "back" of her firearm but that the victim maintained a "strong grip" on its front. The Defendant stated that as they fought for the firearm, the victim accidentally pulled the trigger and shot herself. The victim then "ran outside" and collapsed into the breezeway. The Defendant followed the victim outside with the intention of making sure the victim was okay, but she fled after hearing nearby police sirens, assuming they were for her.

The Defendant noted that she had taught the victim about firearm safety during their relationship, so the victim would have known how to shoot the Defendant's firearm. The Defendant maintained that she "never touched the trigger" during the fight. She also stated that the victim must have "let go of the gun" when she exited the apartment. Though the Defendant conceded that she had several drinks during the party, she denied that she was intoxicated. She clarified that the fight occurred in Brittany's living room, very near to the exit. The Defendant repeatedly asserted that she had not killed the victim, noting that "as much as I have my gun and as much as me and this girl fight, if I had wanted to shoot this girl, I would have [already] shot her."

Detective Miller testified that the Defendant did not appear impaired at any point during her interview. After the interview, Detective Miller called Ms. Singletary, who confirmed that the fight had occurred inside Brittany Majors's apartment. He also traveled to the Defendant's mother's home, where he collected the Defendant's cell phone and an empty Kel-Tec pistol box.

Detective Miller also obtained several surveillance video recordings from the apartment complex's parking lot, and these recordings were played for the jury. The first video, time-stamped at 11:57 p.m. on October 26, 2019, showed a vehicle driving through the parking lot before parking near one of the apartment buildings. After parking, two individuals exited the vehicle, and Detective Miller identified the Defendant as the driver. The Defendant and her companion walked along a sidewalk to a nearby stairwell and entered the apartment building. At 12:10 a.m. on October 27, 2019, a woman with red hair, who Detective Miller identified as the victim, exited the apartment. The Defendant followed the victim from the apartment, and the victim began running from her. The Defendant chased after the victim briefly until the victim stopped to rest near a white vehicle. There, the two appeared to speak to one another while walking in circles around the vehicle. As the victim completed one of her laps around the vehicle, the Defendant began chasing her again. The victim ran around the vehicle once more before running towards Brittany Majors's apartment. They repeated this exchange when they reached the Defendant's vehicle and then walked back inside together. At 12:39 a.m., the Defendant and the victim again exited the apartment and stood very close to one another in the stairwell. The Defendant appeared to push the victim, and the two returned inside. At

12:55 a.m., the Defendant, alone this time, exited the apartment and walked to her vehicle, where she appeared to retrieve something before returning inside. At 12:59 a.m., the Defendant ran out of the apartment, into her car, and drove away. At 1:07 a.m., a police car arrived.

Detective Miller also identified several surveillance video recordings taken from the Defendant's apartment building, which were also played for the jury. Though Detective Miller noted that the recordings had conflicting timestamps, he estimated that they indicated that the Defendant left her mother's apartment around 1:10 a.m. and returned at around 1:25 a.m. Detective Miller also reviewed a photograph taken from one of the surveillance cameras depicting the Defendant and several other individuals exiting the apartment building. Detective Miller testified that the photograph showed the Defendant holding her cell phone at an angle that appeared to match the angle at which she recorded her Facebook Live broadcast.

The State rested, and the Defendant elected not to present additional proof. Upon this evidence, the jury acquitted the Defendant of premeditated first degree murder and convicted her of the lesser-included offense of second degree murder.

## B. Sentencing Hearing

At the Defendant's April 14, 2023 sentencing hearing, the State introduced a copy of the Defendant's presentence report and presented victim impact statements. Mia Washington, the victim's godmother, testified regarding the serious negative impact that the victim's murder had on the victim's family and requested that the trial court impose a maximum sentence. The State also introduced a victim impact statement from Regina Smith, the victim's mother, who explained that the victim's death had imposed a large emotional and psychological toll on her. Ms. Smith noted that she had taken on financial responsibilities for the victim's two young sons. Ms. Smith also requested that the trial court impose a maximum sentence.

Theresa Majors,[3] the Defendant's mother, testified that the Defendant had been the victim of a home invasion while a senior in high school and had sustained an injury which forced her to drop out of school. Theresa Majors testified that the Defendant was "going to get her GED" and had taken classes while incarcerated. She stated that prior to her arrest, the Defendant typically maintained employment at two jobs at a time. Additionally, while released on bond, the Defendant worked at a cleaning service. Theresa Majors further recalled that the Defendant had been scheduled for a mental health appointment to help treat her "emotional problems" prior to her bond's revocation. Theresa Majors also noted that the Defendant had adopted and helped raise a son, with whom she maintained contact while incarcerated.

---

[3] Because this witness shares the Defendant's surname, we will refer to her by her full name for clarity.

In closing, the State argued that "throughout the trial, throughout today, one thing that we have never seen is any remorse whatsoever from the [D]efendant." The State noted that after the Defendant shot the victim, she stepped over her body, fled, and began a Facebook Live broadcast in which she "threaten[ed] people." The State requested that the trial court consider enhancement factor (9), that the Defendant employed a firearm during the commission of the offense, and enhancement factor (10), that the risk to human life was high. T.C.A. §§ 40-35-114(9), (10). For the latter factor, the State argued that the presence of "three other people" and Brittany Majors's young children in the apartment when the victim was murdered justified an enhanced sentence. Accordingly, the State requested that the trial court impose the maximum within-range sentence of twenty-five years.

The Defendant conceded that enhancement factors (9) and (10) applied but argued that they should be given little weight because the Defendant possessed her firearm legally and because she had not been charged with reckless endangerment or aggravated assault on behalf of those present in the apartment when Defendant shot the victim. The Defendant requested that the trial court consider as mitigating proof that the Defendant had a supportive family which had supported her both prior to and after her arrest, that she had "a desire to further her education," that she was "attempting to address some emotional and psychological issues while she was on bond," that she had a consistent and extensive work history, that she had shown responsibility by acting as a "quasi mother figure" to her adopted son both prior to and after her arrest, and that she voluntarily surrendered herself to the police within hours of the shooting. The Defendant therefore requested that the trial court impose the minimum sentence of fifteen years.

The State responded by emphasizing that the Defendant had failed to show any remorse for shooting the victim, to which the Defendant replied that she "had a right not to testify at her trial, to express anything, including remorse." The Defendant also noted that during her interview with Detective Miller, the Defendant repeatedly asked whether the victim was okay and worried about the victim passing away. The Defendant contended that she expressed similar feelings of concern during her Facebook Live videos, stating that she would never hurt the victim.

The trial court held that enhancement factor (9) "very clearly" applied. The trial court also held that enhancement factor (10) applied, concluding that "there were adults present when the shots were fired and there were children at some location within the apartment." The trial court noted that it afforded strong weight to both enhancement factors.

In its consideration of mitigating factors, the trial court found Theresa Majors's testimony "very credible" and noted that "it is clear that this . . . whole situation has had a tremendous negative impact on the [Defendant's] family." Nevertheless, the trial court

declined to mitigate the Defendant's sentence and imposed the maximum sentence of twenty-five years' incarceration, holding

> I do agree with [the State] that [the Defendant] has not one time before this Court expressed any remorse.
>
> She chose – as [defense counsel] correctly pointed out, [the Defendant] exercised her right not to testify at trial. But she could have sat up here today and apologized or expressed some type of remorse for what happened in this case, for destroying the [victim's] family, for the grave negative impact on her own family. And she didn't do that. And she had an opportunity. Not even an allocution, which she could have done without being subject to cross-examination.
>
> Again, those are choices that – she is entitled to make those choices. Those are her choices. But by making those choices, she has given this Court no basis whatsoever to find that she has any remorse or sorrow or anything that would lead me to mitigate her actions in this case.
>
> . . .
>
> So from all of that, the Court does find, within that 15 to 25 year range, with the two enhancement factors that the Court gives great weight to, and in the absence of any – let me just say, again, I heard about the educational pursuits and all those things from [Theresa Majors], but I heard nothing – I did not hear [the Defendant] at any point say I want to further my education, I want to get help for my mental health, I want to, I am sorry for what I did, nothing.
>
> So the Court finds nothing in the proof before it to mitigate the sentence in this case and will therefore sentence [the Defendant] to serve 25 years in the Tennessee Department of Corrections.

The Defendant filed a timely motion for new trial, which was denied. This appeal followed.

## II. Analysis

On appeal, the Defendant argues that the evidence was insufficient to sustain her conviction, that the trial court erred in admitting a series of Facebook Live broadcasts the Defendant recorded shortly after the victim's murder, that the trial court erred in restricting cross-examination of a witness, and that the trial court erred in imposing a maximum sentence because it inappropriately applied an enhancement factor and concluded that no mitigating factors applied. We will consider these issues in turn.

- 14 -

**A. Sufficiency**

The Defendant first challenges the sufficiency of the evidence supporting her conviction for second degree murder. She argues that the State failed to prove that she acted knowingly in killing the victim and that, accordingly, the evidence instead supported a conviction of reckless homicide. The State responds that there was sufficient evidence to support the jury's finding that the Defendant committed second degree murder. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523, 527 (1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Second degree murder is defined as "a knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

Viewed in the light most favorable to the State, the evidence adduced at trial supports the jury's verdict. Ms. Singletary and Brittany Majors gave eyewitness testimony that the Defendant and the victim argued and physically fought each other several times throughout the evening. Ms. Johnson also testified that the Defendant kept "hanging on" to the victim throughout the party and that every time the victim tried to walk away from her, the Defendant followed her. Ms. Singletary recalled that the Defendant told the victim, "Don't make me go to my car," and left the apartment soon thereafter before returning. Brittany Majors agreed that the Defendant left the apartment during an interlude between her fights with the Defendant, and a surveillance video recording of the apartment complex's parking lot showed the Defendant walking to her car, retrieving something, and returning to the apartment. Both Ms. Singletary and Brittany Majors testified that the Defendant, after being readmitted to Brittany Majors's apartment, pulled out her gun and approached the victim. The victim and the Defendant began fighting over possession of the gun, and during this struggle, the victim stated that the Defendant was trying to "take me from my kids," to which the Defendant responded, "F*** your kids." The victim then punched the Defendant in the mouth, and the Defendant shot the victim. From this evidence, a reasonable jury could have concluded that the Defendant was provoked into shooting the victim when the victim punched her in the mouth.

The Defendant argues that the evidence instead supports a conviction for reckless homicide. Reckless homicide is defined as "reckless killing of another," and a person acts recklessly when that person "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. §§ 39-13-215, 39-11-302(c). The Defendant notes that Ms. Singletary and Brittany Majors both admitted that they gave several different accounts to officers after the victim's murder. However, Brittany Majors also stated that she was afraid that she would be charged in relation to the victim's murder because it had occurred in her apartment and conceded that she was "just saying stuff to get people off my back." The jury heard these witnesses' former descriptions of the victim's murder and their testimonies at trial. The Defendant challenges the credibility of these witnesses, but the jury resolved any credibility or factual issues by its verdict in convicting the Defendant, *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987), and we will not disturb this verdict by reweighing or reevaluating the evidence, *Matthews*, 805 S.W.2d at 779. The Defendant is not entitled to relief.

## B. Admission of the Facebook Live Broadcast

The Defendant also challenges the trial court's admission of the recordings of her Facebook Live broadcast. Prior to her trial, the Defendant filed a motion *in limine* seeking the exclusion or redaction of the recordings of her Facebook Live broadcast. She attached a transcript of the broadcast, as captured by Ms. Stevenson's recordings, providing her objections to each statement with their timestamps. The Defendant argued that her broadcast included irrelevant and prejudicial statements, some of which also were inadmissible under Tennessee Rule of Evidence 404(b) and the rule against hearsay. The State opposed this motion *in limine*, arguing that all the Defendant's statements were admissible under a variety of hearsay exceptions and did not run afoul of Rule 404(b).

At the September 30, 2022 evidentiary hearing, the Defendant conceded that certain parts of her broadcast were admissible but argued that the portions of the broadcast in which she described her occasionally violent relationship with the victim were inadmissible because they had the potential to place her character at issue. While she agreed that the statements were likely admissible under several hearsay exceptions, she nevertheless argued that their potential for presenting harmful character evidence was too high. The Defendant contended that it was irrelevant that she created the broadcast herself. She also requested that the trial court redact the video to exclude any comments from Ms. Stevenson and other viewers, arguing that these statements were both irrelevant and inadmissible as hearsay. Additionally, she argued that her agitated and threatening statements in response to Ms. Stevenson's comments should be redacted because they carried a high potential for misleading the jury.

The State responded that the recordings were admissible in their entirety because the Defendant published her statements on a public social media platform shortly after she shot the victim. The State contended that the Defendant's discussion of the murder, her

description of her actions as accidents, and her responses to on-screen comments were highly probative and not unduly prejudicial. The State further argued that it would be difficult to redact the recordings to remove the viewers' comments because doing so would place the Defendant's statements out of context.

In its written order denying the Defendant's motion *in limine*, the trial court declined to redact any portion of the broadcast, finding that though the Defendant's statements were often "damaging," they "also have significant probative value." The trial court concluded that the Defendant's statements were admissible as statements by a party-opponent pursuant to Tennessee Rule of Evidence 803(1.2), as excited utterances pursuant to Rule 803(2), and as statements of her then-existing mental, emotional, or physical condition pursuant to Rule 803(3). Further, the trial court noted that admitting the video would allow the jury to hear the Defendant's version of events and to view her demeanor immediately after the crime. Though it reiterated that the Defendant occasionally made inflammatory statements, the trial court reasoned that there was "nothing to suggest that the video would encourage the jury to make any decision on an improper basis." The trial court concluded that the Defendant's descriptions of her occasionally violent relationship with the victim were admissible to demonstrate the Defendant's motive, intent, absence of mistake or accident, and a settled purpose to harm the victim pursuant to Rule 404(b). The trial court agreed with the State that any attempt to redact the recordings to remove comments placed by Ms. Stevenson and other broadcast viewers would be very difficult and, regardless, that these comments were admissible to provide context for the Defendant's statements. The trial court stated that it would provide a limiting instruction to the jury "to consider the comments only as context to the Defendant's statements" rather than as substantive evidence.

On appeal, the Defendant argues that though portions of her Facebook Live broadcast were relevant, many other portions were not, and the trial erred by declining to redact these irrelevant and prejudicial portions. She also argues that certain of her statements were inadmissible under Tennessee Rule of Evidence 404(b). The State responds that the recordings were relevant, highly probative of the Defendant's culpable mental state immediately following the victim's murder and her attempts to deny her involvement therein, and that their admission did not violate Rule 404(b). We will address these issues in turn.

### 1. Rule 403

The Defendant argues that in declining to redact or exclude the recordings of her Facebook Live broadcast, the trial court erred by concluding that certain portions of the broadcast were relevant and not unduly prejudicial. The State responds that the trial court did not abuse its discretion in declining to redact the recordings, given their unique nature, and that any error in the admission of unduly prejudicial evidence was harmless. We agree with the State.

- 18 -

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The Defendant argues that "large sections" of her Facebook Live broadcast were inadmissible because they were irrelevant and highly prejudicial. She specifically identifies her threats to kill Ms. Stevenson and her son, a "lengthy exchange of insults" with Ms. Stevenson in which the Defendant disparages Ms. Stevenson's appearance and weight, her denials that she shot the victim, her attempts to discredit any other eyewitness accounts, her requests to smoke a cigarette, and "the repeated, often jumbled and profanity-laced exchanges with off-camera interlocutors" about ending her broadcast. The Defendant only specifically identifies these sections of her Facebook Live broadcast as irrelevant and prejudicial, but she also states in her brief that "[s]everal other sections of the Facebook Live recording are similarly irrelevant and subject to redaction. For purposes of this appeal, [the Defendant] adopts the notations regarding relevance contained in the submitted transcript. These irrelevant sections comprise a significant portion of the 20-minute recording. It was error to permit their admission." Because the Defendant does not specifically identify these "other sections" of her recording which she deems objectionable and does not make specific objections and arguments against their admission on appeal, any arguments regarding these "other sections" are waived on appeal. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also State v. Bonds*, 502 S.W.3d 118, 144 (Tenn. Crim. App. 2016) (holding that where an appellate brief fails to "specifically identify which evidence [the defendant] deems improper" and makes "only a general complaint," the defendant waives the issue for appellate review.).

In finding the Defendant's statements in her Facebook Live broadcast relevant and admissible, the trial court stated that though the statements were "certainly damaging," "they also have significant probative value. The video allows the jury to see the Defendant's demeanor and hear her version of events immediately after the crime. There is nothing to suggest that the video would encourage the jury to make any decision on an improper basis." We find nothing in the record or in our review of the Facebook Live broadcast to indicate that the trial court abused its discretion in admitting the broadcast in

its entirety. First, we agree with the trial court that, given the nature of the recording, any attempt to redact the video would have reduced it to a "conglomerate of piecemeal statements." Though admitting the video allowed the jury to review irrelevant evidence, such as the Defendant's requests to smoke a cigarette or her responses to off-screen speakers, we do not believe that this carries any undue prejudice requiring its exclusion. Additionally, the trial court twice instructed the jury that it was only to consider the "comments that were scrolling," "things typed on the screen," and "voices in the background" as context for the Defendant's statements rather than substantive proof, and that only the Defendant's statements were to be considered as substantive proof. The jury is presumed to follow the trial court's instructions. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994).

Throughout her broadcast, the Defendant maintained that she was innocent. She repeatedly denied that she had shot the victim and discussed whether she should surrender to the police to clear her name. The Defendant identifies her insults towards Ms. Stevenson and her son in which she disparages Ms. Stevenson's weight and threatens to kill Ms. Stevenson's son as unduly prejudicial. However, the Defendant's insults towards Ms. Stevenson were in response to Ms. Stevenson's repeated comments in which she blamed the Defendant for the victim's murder. Therefore, the Defendant's insults and threats, along with her attempts to discredit the accounts of eyewitnesses, were probative of her continued maintenance of her innocence. *See State v. Austin*, 87 S.W.3d 447, 477 (Tenn. 2002) ("Generally, evidence of threats against witnesses attributed to the accused is probative as being either (1) conduct inconsistent with the accused's claim of innocence or (2) conduct consistent with the theory that the making of such threats evinces a consciousness of guilt."), *abrogated on other grounds by Miller*, 638 S.W.3d at 150-151. Accordingly, because any attempt to redact the recordings of the Defendant's broadcast would have reduced its high probative value and because the evidence was not outweighed by any danger of undue prejudice, the trial court did not abuse its discretion in admitting the entire broadcast. The Defendant is not entitled to relief.

## 2. Rule 404(b)

The Defendant also contends that the trial court erred in determining that her Facebook Live broadcast was admissible under Rule 404(b). She argues that the trial court's decision should be reviewed *de novo* because the trial court did not specifically address her arguments that her threats to Ms. Stevenson and her son were inadmissible propensity evidence. She also argues that, regardless of the standard of review, none of the exceptions to Rule 404(b) apply to her statements. The State responds that the trial court substantially complied with Rule 404(b)'s requirements and did not err because the Defendant's statements were highly probative of her intent and guilty mental state.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid.

404(b). Such evidence may be admissible, however, for "other purposes." *Id*. If the evidence sought to be admitted is relevant to an issue other than the accused's character, such as identity, motive, common scheme, intent, or rebuttal of accident or mistake, it may be admitted for that purpose so long as the danger of unfair prejudice does not outweigh the probative value. Tenn. R. Evid. 404(b), *Advisory Comm'n Cmts*. When a party seeks to introduce evidence of other crimes, wrongs, or acts, the trial court must: (1) hold a hearing outside the jury's presence; (2) determine whether a material issue exists other than conduct conforming with a character trait and, upon request, state the basis for its determination; (3) find proof of the other crime, wrong, or act to be clear and convincing; and (4) determine that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for character offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002).

When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Any error in the admission of the evidence does not require reversal unless it "more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Jones*, 450 S.W.3d 866, 900 (Tenn. 2014).

In her motion *in limine*, the Defendant requested that the trial court exclude the sections of her broadcast in which she made threatening statements towards Ms. Stevenson. She argued that Ms. Stevenson's comments were "intended to . . . elicit an agitated response" from the Defendant and that the Defendant responded by "mak[ing statements] that could be perceived as threats towards [Ms. Stevenson] and [her] son." She argued that the threats were irrelevant and that "the only purpose the State could conceivably have for introducing these portions of the video is to show that [the Defendant] is generally an angry, violent person, which is precisely the type of propensity reasoning [Rule] 404(b) prohibits juries from engaging in."

The trial court held that the Facebook Live recording was admissible and did not violate Rule 404(a) or Rule 404(b). In its order denying the Defendant's motion *in limine*, the trial court held that the Defendant's description of her occasionally violent relationship with the victim was admissible under Rule 404(a) because they were not character evidence and were admissible "under Rule 404(b) for other material purposes, *i.e.*, motive, intent, absence of mistake or accident, and a settled purpose to harm the victim." The trial court also held, in a separate paragraph, that the Defendant's responses to the comments left by Ms. Stevenson and other viewers on her broadcast were admissible. The trial court's order was perfunctory and dealt with the Defendant's Rule 404(b) arguments generally. Because

the trial court did not comply with Rule 404(b)'s procedural requirements, we review its decision *de novo*. *DuBose*, 953 S.W.2d, at 652.

As explained above, the Defendant's threats towards Ms. Stevenson and her son were certainly damaging. However, throughout the broadcast, the Defendant maintained that she was innocent, and her threatening statements were made in response to Ms. Stevenson's repeated accusations that the Defendant had murdered the victim. Though provocative, these statements were admissible under Rule 404(b) because they are probative of the Defendant's consciousness of guilt. *See Austin*, 87 S.W.3d at 477. The Defendant's threats towards Ms. Stevenson when viewed in the context of her repeated denials of culpability are also probative of her intent. *State v. Jauregui*, No. E2006-00868-CCA-R3-CD, 2007 WL 2700057, at *12 (Tenn. Crim. App. Sept. 17, 2007) ("Evidence of efforts to conceal the crime . . . is highly probative to establish the intent of a perpetrator.") Though the Defendant's threats and insults were inflammatory, we do not believe that they were so prejudicial that they persuaded the jury to convict the Defendant on an inappropriate basis, particularly in light of the sufficiency of the convicting evidence. Given the highly probative nature of the Defendant's broadcast, the trial court did not err in admitting it in its entirety. The Defendant is not entitled to relief.

### C. Restriction of Cross-Examination

The Defendant next argues that the trial court erred in restricting her from cross-examining Brittany Majors regarding threats she stated she felt from the victim's family. The Defendant argues that a more complete cross-examination would have allowed her to demonstrate that Brittany Majors's testimony implicating the Defendant in the victim's murder was in part motivated by her fear of retaliation from the victim's family. The State responds that the Defendant waived this issue by failing to make an offer of proof, and that, despite the trial court's restriction of cross-examination, Brittany Majors testified that she feared backlash from the victim's family. We agree with the State.

Before Brittany Majors testified at trial, the State requested a jury-out hearing to determine the admissibility of her testimony regarding an alleged incident in which Brittany Majors had been maced by Ms. Stevenson. The Defendant sought to cross-examine Brittany Majors about this incident to demonstrate her potential bias against the Defendant. The Defendant argued that allowing Brittany Majors to testify about the incident would be particularly helpful to impeach her in light of her differing accounts of the victim's murder. The Defendant further contended that Brittany Majors would testify that she felt threatened by the victim's family. The State argued that this testimony was irrelevant because the alleged incident had occurred as long as one year after the victim's murder. The trial court held that the Defendant could not cross-examine Brittany Majors about the alleged incident, finding that the topic went beyond any witness credibility issue because it had occurred so long after the victim's murder. However, the trial court stated

that it would allow the Defendant to inquire as to any pressure or coercion Brittany Majors had felt from the victim's "people" to persuade her to change her story.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *see Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *see State v. Fowler*, 373 S.W.2d 460, 466 (Tenn. 1963).

The Tennessee Rules of Evidence define the scope of cross-examination. Rule 611(b) says, "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility, except as provided in paragraph (c)(2) of this rule," with paragraph (c)(2) limiting the scope of cross-examination when a party calls an adverse witness. Tenn. R. Evid. 611(b). In addition, Rule 616 states, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. "A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). The right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. Tenn. R. Evid. 401, 402 (providing that "evidence which is not relevant is not admissible"); *see Monts v. State*, 379 S.W.2d 34, 40 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 889 (Tenn. 2013); *see also State v. Adkisson*, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994); *State v. Rhoden*, 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987); *State v. Braggs*, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980); *Taylor v. State*, 551 S.W.2d 331, 335 (Tenn. Crim. App. 1976).

We agree with the State that the Defendant's failure to make an offer of proof precludes our review of her claim of error. Tennessee Rule of Evidence 103(a)(2) provides that a party may only appeal the suppression of evidence where "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." When that challenged evidence consists of oral testimony, "it is essential that a proper offer of proof be made in order that the

appellate court can determine whether or not exclusion was reversible." *State v. Goad*, 707 S.W.2d 846, 852–53 (Tenn.1986). Without an offer of proof, we are unable to determine how Brittany Majors's testimony regarding her alleged encounter with Ms. Stevenson would have affected her credibility as a witness. Accordingly, the issue is waived.

Waiver notwithstanding, we note that despite the trial court's restriction of cross-examination, Brittany Majors testified that she felt afraid to tell the truth about the victim's murder because she was getting "backlash[] from [the victim's] family, people that I've never seen," noting that she was "getting maced in Kroger." Though the State reminded the witness that she was not to discuss the alleged incident, the jury heard at least some evidence regarding the pressure Brittany Majors may have felt from the victim's family. Additionally, Brittany Majors testified that when speaking to an unknown caller several days after the victim's murder, she stated that she "said some things that didn't make sense" because she was "just saying stuff to get people off my back . . . because it was just a lot going on," and that she was reluctant to admit that the shooting had occurred inside her apartment because she was afraid of being "charged with something." It is not apparent that any additional cross-examination into an alleged instance of violence perpetrated by Ms. Stevenson would have been of further relevance to Brittany Majors's credibility as a witness. The Defendant is not entitled to relief.

## D. Sentencing

Finally, the Defendant challenges her sentence as excessive. Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five years' incarceration, the maximum within-range sentence for a conviction of second degree murder. T.C.A. §§ 39-13-201(c), 40-35-112(a)(2). The Defendant argues that the trial court departed from the purposes and principles of the Sentencing Act by impermissibly drawing an adverse inference from her exercise of her privilege against self-incrimination. Accordingly, the Defendant requests that we review her sentence for an abuse of discretion with no presumption of reasonableness. The Defendant argues that the trial court abused its discretion by imposing a maximum sentence both because it concluded no mitigating factors applied to reduce her sentence, contending that the trial court "refused" to consider her mitigating proof because of her exercise of her privilege against self-incrimination, and because the trial court inappropriately applied enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-35-114(10). The State responds that the trial court did not draw an adverse inference from the Defendant's silence, did not abuse its discretion in concluding that no mitigating factors applied, and appropriately applied enhancement factor (10). We will address these issues in turn.

## 1. Standard of Review

The Defendant argues that the trial court departed wholly from the purposes and principles of the Sentencing Act by drawing an adverse inference about the facts of the crime from her constitutionally protected invocation of her privilege against self-incrimination both at trial and at her sentencing hearing. She argues that the trial court's statements during sentencing indicate that it "refused to consider the mitigation facts that [the Defendant] established with credible evidence" by requiring that the Defendant "testify to proposed mitigation facts and that she must express remorse." In imposing these "conditions," the Defendant alleges that the trial court failed to meet the strictures of Code section 40-35-210, which require the trial court to consider mitigating evidence in fashioning its sentence. *See* T.C.A. §§ 40-35-210(b)(1), (5). The State responds that the trial court's decision is entitled to a presumption of reasonableness because it did not draw an adverse inference from her silence and considered the mitigating proof presented. We agree with the State.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

We first address the question of whether the trial court drew an impermissible adverse inference from the Defendant's invocation of her privilege against self-incrimination. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. This privilege against self-incrimination applies both at trial and during sentencing. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."); *see also Mitchell v. United States*, 526 U.S. 314, 326 (1998) (extending *Estelle*'s holding to noncapital cases).

In *Mitchell v. United States*, the Supreme Court held that where a criminal defendant exercises the privilege against self-incrimination during sentencing, the trial court may not draw any adverse factual inferences regarding the circumstances of the crime from the defendant's silence. *Mitchell*, 526 U.S. at 328. Though the defendant in *Mitchell* pleaded guilty to several drug conspiracy offenses, she did not testify as to the amount of drugs she trafficked. *Id*. at 318. Because the amount of drugs trafficked determined the appropriate sentence, the prosecution presented proof that the defendant had sold at least five kilograms of narcotics during the conspiracy through a series of twice-weekly transactions. *Id*. at 319. In fashioning her sentence, the trial court explicitly stated, "I held it against you that you didn't come forward today and tell me that you really only did this a couple of times . . . I'm taking the position that you should come forward and explain your side of this issue." *Id*. In reversing, the Supreme Court held that this statement indicated that the trial court had drawn an adverse factual inference about the circumstances of the crime from the defendant's silence. *Id*. at 328.

However, *Mitchell* was narrowly tailored and left open the question of "[w]hether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in the [United States Sentencing Guidelines]." *Id*. at 330. Subsequent cases have clarified that *Mitchell*'s narrow holding "leaves the door open" to drawing "*some* actual inferences" from the defendant's silence during sentencing. *White v. Woodall*, 572 U.S. 415, 422-23 (2014) (emphasis in original); *see also United States v. Kennedy*, 499 F.3d 547, 552 (6th Cir. 2007) (concluding that *Mitchell* "does not limit the district court's ability to consider a wide variety of information concerning the background, character, and conduct of the defendant in determining an appropriate sentence."). Panels of this court have since answered *Mitchell*'s question and held that a trial court does not violate a defendant's Fifth

Amendment rights when it considers her silence in determining remorse at sentencing. *See State v. Bonilla*, No. M2019-01193-CCA-R3-CD, 2020 WL 3791677, at \*14-15 (Tenn. Crim. App. July 7, 2020) (finding no *Mitchell* violation where the trial court concluded the defendant "has shown absolutely no potential for rehabilitation . . . [or] expression of remorse" by his refusal to testify because this consideration did not concern factual determinations about the circumstances of the crime and instead was made "in light of his potential for rehabilitation and remorse."), *no perm. app. filed*; *State v. Irizzary*, No. M2016-00465-CCA-R3-CD, 2017 WL 1205960, at \*8 (Tenn. Crim. App. Mar. 31, 2017) (finding no *Mitchell* violation because the record did not "support a conclusion that the trial court took into account the defendant's failure to [allocute]" and instead "relied on the defendant's failure to accept responsibility and her lack of remorse in denying an alternative sentence."), *perm. app. denied* (Tenn. July 28, 2017); *c.f. State v. Souder*, 105 S.W.3d 602, 607-08 (Tenn. Crim. App. 2002) (affirming the trial court's denial of probation despite the trial court's statements that the defendant's silence in response to a prosecutor's question whether he had molested children was "not putting his best foot forward" because the trial court did not draw adverse inferences about the crime from the defendant's silence and instead used the defendant's silence as part of its "overall calculus").

Here, the issue of the Defendant's remorse was first raised through the State's closing arguments. The Defendant responded that though she did not testify at trial or at sentencing, her statements in her Facebook Live broadcast and to the police indicated that she was very concerned for the victim's wellbeing and, further, the Defendant repeatedly called one of the witnesses shortly after the shooting. In light of this proof, the Defendant argued that "you can't just say that [the Defendant] just left and walked away and didn't care because we do have those phone calls." Later, the Defendant added, "I don't think it is fair to say [the Defendant] has never expressed any remorse when she chose [not] to testify at her trial and she does have other statements in addition to the Facebook Live video." In considering whether the evidence established the Defendant's remorse, the trial court plainly relied in part upon the Defendant's silence, as well as "Ms. Washington's statement that [the Defendant] committed murder and tried to excuse it away on a live stream." The trial court did not violate *Mitchell* by drawing an adverse factual inference about the circumstances of the case from the Defendant's silence.

The Defendant also argues that the trial court refused to consider her mitigating evidence because she did not testify. In summarizing the proof at the sentencing hearing, the trial court stated:

> I heard the testimony of [Theresa Majors] and I found her testimony to be very credible. I mean, she clearly loves her daughter. And she – the family is here and obviously she has great family support. And I heard testimony from [Theresa Majors] about [the Defendant's] education, about her seeking help for emotional problems and the things that she does in her personal life. . . . And again, I found her testimony to be very credible. And it is clear that

this – that this whole situation has had a tremendous negative impact on the Majors family.

. . .

[L]et me just say, again, I heard about the educational pursuits and all those things from [Theresa Majors], but I heard nothing – I did not hear [the Defendant] at any point say I want to further my education, I want to get help for mental health, I want to, I am sorry for what I did, nothing.

Inasmuch as the trial court's statements imply that the Defendant was required to corroborate the mitigation evidence, she presented by testifying, we are aware of no precedent to support this proposition. *See State v. Smith*, No. M2023-00367-CCA-R3-CD, 2024 WL 1699210, at *7 (Tenn. Crim. App. Apr. 19, 2024) (rejecting the State's suggestion that the defendant must corroborate mitigating proof presented at sentencing), *no perm. app. filed*. However, we do not believe that this implication is fatal because it cannot be said that the trial court did not consider the Defendant's mitigating proof. The trial court clearly articulated that it found Theresa Majors's testimony credible, considered the weight of that testimony in the context of the factors the Defendant argued, and concluded that no mitigating factors applied. The trial court was therefore well-within its discretion in concluding that no mitigating factors applied to reduce the Defendant's sentence. Because the trial court also considered the presentence report, the risk and needs assessment, the appropriate sentencing range, the evidence presented both at trial and during sentencing, the purposes and principles of the Sentencing Act, the applicable enhancement and mitigating factors, and articulated the enhancement and mitigating factors it found applicable and the reasons therefore, we afford the trial court's decision the presumption of reasonableness.

## 2. Application of Enhancement Factor (10)

The Defendant argues that the trial court abused its discretion by sentencing her to twenty-five years' incarceration because it inappropriately imposed enhancement factor (10). The Defendant concedes that the trial court appropriately applied enhancement factor (9). The State argues that the trial court appropriately applied enhancement factor (10) and did not abuse its discretion in imposing the maximum sentence.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, 380 S.W.3d at 707. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id*. So long as there are other reasons consistent with the purposes and principles of sentencing, a sentence within the appropriate range should be upheld. *Id*.

The Defendant argues that the trial court misapplied enhancement factor (10) because though Brittany Majors's children were indeed present in the apartment when the Defendant shot the victim, they were in the "back bedroom," separated from the living room. Further, though Brittany Majors and Ms. Singletary were both present in the living room when the Defendant shot the victim, "the record contains no clear proof of how proximate these individuals were to the shooting." We agree that the application of this enhancement factor was inappropriate.

"Although [enhancement] factor (10) is inherent in every homicide . . . when based upon the use of a deadly weapon, it may [be] appropriately applied when there is a risk to the life of someone other than the victim." *State v. Porrata*, No. W2011-00749-CCA-R3-CD, 2012 WL 5199693, at *6 (Tenn. Crim. App. Oct. 22, 2012) (collecting cases). Though Brittany Majors testified that she was "frozen", and Ms. Singletary testified that she was afraid of the Defendant, the record demonstrates that the victim was the sole target of the Defendant's ire. *See State v. Hill*, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994) (application of enhancement factor (10) was erroneous where the Defendant's "wrath and vindictiveness was directed solely at" the victim and "[t]he record is void of any evidence that individuals in close proximity were in danger of being injured."). The Defendant cites several cases in support of her position, and we find them convincing based on the facts of this case. *See State v. Whitmire*, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178, at *10 (Tenn. Crim. App. Aug. 13, 2009) (application of enhancement factor (10) was erroneous where the trial court considered the presence of the victim's children, who, though present in the home when the offense occurred, were in their bedrooms and apart from the offense); *State v. Baldwin*, No. 01C01-9612-CR-00530, 1998 WL 426199, at *8 (Tenn. Crim. App. July 29, 1998) (application of enhancement factor (10) was erroneous where the trial court considered the presence of a patron located behind the defendant).

The State cites *State v. Dotson*, No. M2018-00657-CCA-R3-CD, 2019 WL 3763970, at *10 (Tenn. Crim. App. Aug. 9, 2019), in support of its argument that this Court should affirm because we have "previously upheld the consideration of [enhancement factor (10)] involving a shooting inside [an] apartment in the presence of someone other than the victim." In that case, the defendant indeed shot several times in a small apartment, but the State established that he did so "in the direction of the victim and" another individual. *Id*. at *2. The State did not establish that the Defendant shot at or endangered anyone besides the victim in this case, so application of enhancement factor (10) was inappropriate. Without any proof of the size of Brittany Majors's living room, where the Defendant and victim were located therein when the Defendant shot the victim, and where Brittany Majors or Ms. Singletary stood, and in light of the fact that the Defendant, by all accounts, was focused entirely on the victim throughout the night and shot only once, we are unable to concur in the trial court's application of enhancement factor (10).

However, the misapplication of this enhancement factor does not invalidate the Defendant's sentence. *Bise*, 380 S.W.3d at 707. The Defendant concedes on appeal, as

she did at sentencing, that the trial court appropriately applied enhancement factor (9), that the Defendant employed a firearm during the commission of the offense.  Because the application of a single enhancement factor can justify a maximum sentence, the trial court did not err in sentencing the Defendant to twenty-five years' incarceration.  *State v. Mayberry*, No. E2019-01597-CCA-R3-CD, 2019 WL 2775615, at *5 (Tenn. Crim. App. July 2, 2019), *no perm. app. filed* (citing *State v. Moore*, No. W2015-01483-CCA-R3-CD, 2016 WL 7654955, at *5 (Tenn. Crim. App. Aug. 23, 2016)).  The Defendant is not entitled to relief.

### III.  Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

- 30 -